# United States Court of Appeals for the Federal Circuit

03-5087, -5095


CENTEX CORPORATION and
CTX HOLDING COMPANY,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.


Kent A. Yalowitz, Arnold & Porter, of New York, New York, argued for plaintiffs-cross appellants. With him on the brief were Melvin C. Garbow, Howard N. Cayne, Arnold & Porter, of Washington, DC. Of counsel on the brief was Thomas R. Dwyer, of Arlington, Virginia.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; Jeanne E. Davidson, Deputy Director; and Paul G. Freeborne, Trial Attorney.


Appealed from:     United States Court of Federal Claims

Senior Judge Eric G. Bruggink

# United States Court of Appeals for the Federal Circuit

03-5087, -5095

CENTEX CORPORATION and
CTX HOLDING COMPANY,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  January 19, 2005

_____

Before MICHEL, Chief Judge,[*] BRYSON, and LINN, Circuit Judges.

BRYSON, Circuit Judge.

This case requires us to decide whether the government breached a contract with plaintiffs Centex Corporation and CTX Holding Company when Congress enacted certain tax legislation in 1993.  The plaintiffs argue that the 1993 legislation breached the contract because it changed the tax laws to abrogate tax benefits to which they were entitled at the time the contract was executed and because the legislation specifically targeted the benefits they enjoyed under the contract.

The Court of Federal Claims agreed with the plaintiffs as to liability, holding that under the pre-1993 tax laws they were entitled to the tax benefits in question and that

---

[*]    Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

the legislative abrogation of those benefits breached the government's implied covenant of good faith and fair dealing under the contract. Although the court ruled for the plaintiffs on liability, it limited the damages to the amount available under the original contract, holding that a later agreement among the parties did not entitle the plaintiffs to increased damages. The government has appealed from the finding of liability and the entry of a judgment for damages. The plaintiffs have cross-appealed from the court's denial of their request for additional damages. We affirm the judgment in all respects.

I

The savings and loan crisis that led to the events at issue in this case has been chronicled in detail elsewhere. See United States v. Winstar Corp., 518 U.S. 839 (1996); Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365 (Fed. Cir. 2001). In brief, high interest rates and inflation in the late 1970s and early 1980s left many savings and loan associations (or "thrifts") in distress. Many of the thrifts' assets consisted of long-term, fixed-rate mortgages created when interest rates were low, yet the thrifts had to pay high interest rates during that period to attract deposits. As a result, many thrifts failed and others found themselves in precarious financial condition. The government sought to mitigate the effects of the crisis in the industry by inducing healthy financial institutions to take over troubled thrifts in order to avert their collapse and the consequent burden on the government as the insurer of many of the thrifts' depositors.

One of the takeover arrangements involved the Centex Consolidated Group, a group of affiliated corporations consisting of Centex Corporation and its direct and indirect subsidiaries: Centex International, Inc.; Centex Real Estate Corporation; CTX

Holding Company ("CTX"); and Texas Trust Savings Bank FSB ("Texas Trust"). In late December 1988, representatives of the Centex Consolidated Group acquired four thrifts in receivership, whose liabilities far exceeded their assets. Following negotiations with representatives of the Federal Home Loan Bank Board ("the FHLBB") and its constituent deposit insurance agency, the Federal Savings and Loan Insurance Corporation ("FSLIC"), the Centex Consolidated Group representatives agreed to acquire the four thrifts in exchange for various considerations offered by FSLIC. The acquisition was effected through a contract between FSLIC, as receiver for the four thrifts, and two of the Centex Consolidated Group companies—CTX and its wholly owned subsidiary, Texas Trust. Under the contract, referred to as the Assistance Agreement, Texas Trust agreed to acquire the four thrifts, succeeding to all of their assets and assuming all of their liabilities. In return, FSLIC agreed to provide payments to Texas Trust to offset some of the liabilities of the acquired thrifts. In particular, the Assistance Agreement defined certain assets of the acquired institutions, including outstanding loans, as "covered assets." Under the agreement, FSLIC bound itself to make assistance payments to Texas Trust in an amount equal to the difference between the book basis of the covered assets and the value of those assets when they were sold or written down.

A major attraction of the Assistance Agreement for the Centex Consolidated Group consisted of the tax benefits that the Consolidated Group expected to receive as a result of the transaction. In particular, the owners of the Consolidated Group expected that the net liabilities of the acquired thrifts would give rise to tax deductions, which the Consolidated Group could use to shelter other income on its consolidated tax

return. In light of certain provisions of the Internal Revenue Code then in effect, the Consolidated Group expected to be able to take deductions for the built-in losses on the covered assets as those assets were liquidated or written down, even though the losses would be offset by the assistance payments from FSLIC.

That expectation was not unilateral. In the request for proposals for the acquisition of failing thrifts, the FHLBB and FSLIC advised prospective acquiring institutions that among the tax benefits of acquiring such thrifts would be that the "tax basis of the assets of the acquired institution will carry over to the acquirer and permit the acquirer to recognize a tax loss upon the disposition of the acquired asset which has a tax basis greater than its fair market value." The request for proposals further explained that the pertinent tax provisions

> have the effect of permitting an acquiring institution to realize tax benefits attributable to a particular item even though FSLIC assistance is received with respect to such item. For example, if the acquirer receives coverage for capital losses incurred on the disposition of identified assets of the acquired institution, the acquirer is entitled to deduct such loss for federal income tax purposes, notwithstanding that it is reimbursed for the loss by the FSLIC, and that the FSLIC payment is tax free.

Under the Assistance Agreement, CTX and Texas Trust agreed to share the resulting tax benefits with FSLIC. The FHLBB approved the acquisitions after CTX and Texas Trust agreed to increase FSLIC's share of the tax benefits that CTX and Texas Trust obtained as a result of the transaction to 50 percent. The Assistance Agreement specifically identified the shared tax benefits as including deductions for losses on covered assets, deductions for worthless or partially worthless debts, or deductions for increases in bad debt reserves.

Following the acquisitions, Texas Trust began receiving assistance payments from FSLIC as the acquired thrifts' covered assets were liquidated, written off, or written down in value. The Consolidated Group then claimed deductions for the built-in losses on the liquidated, written off, or written down assets. Although the Internal Revenue Service investigated those deductions, the Consolidated Group was permitted to take the deductions, either in whole or in part, until 1991, and it continued claiming the deductions until 1993.

In that year, Congress enacted section 13224 of the Omnibus Budget Reconciliation Act, Pub. L. No. 103-66, § 13224, 107 Stat. 312, 485-86, which is known as the Guarini amendment. The Guarini amendment purported to "clarif[y]" the tax treatment of FSLIC assistance payments to institutions that were acquiring failed thrifts, but it had the effect of disallowing such institutions from claiming deductions for the built-in losses on assets covered by the FSLIC assistance agreements. The Guarini amendment had that effect because it required FSLIC assistance payments to be taken into account in determining whether the taxpayer suffered a deductible loss under sections 165, 166, 585, or 593 of the Internal Revenue Code, 26 U.S.C. §§ 165, 166, 585, 593 (1988). For purposes of section 165, the Guarini amendment provided that any FSLIC assistance payments "with respect to any loss of principal, capital, or similar amount upon the disposition of any asset" had to be "taken into account as compensation for such loss for purposes of section 165" in determining whether the disposition of a covered asset gave rise to a deductible loss. Pub. L. No. 103-66, § 13224(a)(1), 107 Stat. 312, 485 (1993). And for purposes of sections 166, 585, and 593, the Guarini amendment required that FSLIC assistance payments with respect to

any debt had to be taken into account "in determining whether such debt is worthless (or the extent to which such debt is worthless), and in determining the amount of any addition to a reserve for bad debts arising from the worthlessness or partial worthlessness of such debts." Id. § 13224(a)(2), 107 Stat. at 485. The Guarini amendment was made retroactive to taxable years ending on or after March 4, 1991. Id. § 13224(c), 107 Stat. at 485.

In 1994, CTX and Texas Trust entered into an agreement with the Federal Deposit Insurance Corporation ("FDIC"), as successor to FSLIC. The agreement, referred to as the Termination Agreement, transferred the acquired thrifts back to the government and ended the assistance payments. In addition, the Termination Agreement released the FDIC from any claims related to the Assistance Agreement, but it reserved to CTX and Texas Trust the right to bring any claim against the United States "based on legislation that resulted in the reduction or elimination of contractual benefits" with respect to the FSLIC-assisted acquisition of the failing thrifts. After the Termination Agreement was executed, Centex Corporation and CTX Holding Company brought this action against the United States in the Court of Federal Claims, alleging that the enactment of the Guarini amendment constituted a breach of the Assistance Agreement and that the government was liable for damages. By that time, Texas Trust had been dissolved and liquidated, and it was therefore not made a plaintiff in this action.

After extensive discovery and comprehensive submissions by the parties, the Court of Federal Claims entered summary judgment in favor of the plaintiffs. The court began by noting that the Assistance Agreement did not explicitly guarantee that the

Consolidated Group would be permitted to deduct the built-in losses on the covered assets. The court held, however, that the enactment of the Guarini amendment breached the government's implied duty of good faith and fair dealing under the contract. The court based that ruling on its conclusion that, at the time of the acquisitions, the Consolidated Group was entitled to deduct the built-in losses of the acquired thrifts irrespective of the assistance payments from FSLIC. The court held that the owners of the Consolidated Group regarded that item of favorable tax treatment as an important part of the consideration under the agreement and that it was reasonable for them to expect that the government would not eliminate that element of the contract consideration through legislation specifically targeting those benefits. The court found that the breach resulted in injury to the plaintiffs, and it entered judgment in favor of Centex Corporation and CTX for the value of the tax benefits that the Consolidated Group lost as a result of the breach. The judgment for damages and interest amounted to slightly more than $28 million.

On appeal, the government challenges the decision of the trial court on a number of grounds. It asserts: (1) Centex Corporation was not a party to the Assistance Agreement, and neither Centex Corporation nor CTX has standing to sue for breach of that agreement; (2) as a matter of tax law, the plaintiffs did not have the right to take tax deductions for the thrifts' built-in losses, either before or after the enactment of the Guarini amendment, and the enactment of the Guarini amendment therefore did not harm the plaintiffs; (3) even if the Guarini amendment made a substantive change in the plaintiffs' right to deduct the built-in losses, the enactment of the Guarini amendment did not breach the government's implied duty of good faith and fair dealing under the

Assistance Agreement; (4) regardless of any rights the plaintiffs may have had under the Assistance Agreement, the Termination Agreement waived the plaintiffs' right to assert the present claims against the United States; and (5) even if the government was liable for breach, the award of damages was incorrect. In their cross-appeal, Centex Corporation and CTX argue that under a proper construction of the Termination Agreement, the court should have increased the award of damages to an amount slightly in excess of $55 million.

II

Before turning to the merits, we address the government's argument that neither Centex Corporation nor CTX has standing to sue for breach of contract. The government argues that Centex Corporation was not a party to the Assistance Agreement, nor was there an implied contract between the government and Centex Corporation on which an award of damages could be based. Although CTX was a signatory to the Assistance Agreement, the government contends that CTX did not have any income during the pertinent periods and therefore could not suffer a loss from the disallowance of potential tax deductions. Because CTX did not suffer any injury, the government argues, it lacks standing to sue for damages.

The trial court first held that although Centex Corporation was not a signatory to the Assistance Agreement, it was nevertheless a party to that agreement with the right to sue for its breach. The court relied particularly on Section 18(c) of the agreement, which provided that Texas Trust "shall file its tax returns, including the filing of consolidated or separate returns, in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance" from FSLIC. The trial court noted

that Texas Trust could not file a consolidated return on its own, but could do so only with the cooperation of Centex Corporation, the parent corporation of the Consolidated Group. For that reason, the court concluded that Centex Corporation obligated itself to file a consolidated return with Texas Trust.

As an alternative ground for finding that Centex Corporation had standing to sue for breach of contract, the trial court found that the corporation was a party to an implied-in-fact contract with the government that the corporation was entitled to enforce. In making that finding, the court determined that the acquisition of the four failing thrifts, although formally recognized in the Assistance Agreement, was the product of a broader agreement between Centex Corporation and the FHLBB. As the court characterized that broader agreement, the FHLBB authorized Centex Corporation's subsidiaries to acquire the four thrifts conditioned on the agreement of Centex Corporation, as parent of the Centex Consolidated Group, to maximize the tax benefits from the acquisition and share those benefits with FSLIC. Centex Corporation and CTX argue that in light of the trial court's characterization of the acquisition transaction, the necessary elements of an implied contract—mutuality of intent, offer and acceptance, and consideration—were all present.

On appeal, the government challenges the trial court's finding of an express and implied-in-fact contract between FSLIC and Centex Corporation. The government therefore argues that Centex Corporation lacks standing to sue. It is unnecessary for us to decide whether Centex Corporation and the government entered into either an express or implied-in-fact contract, however, because the outcome of this case does not depend on the resolution of that question. That is because even if Centex Corporation

could not sue for breach of contract with the government, Centex Corporation's wholly owned subsidiary, CTX, was a party to the Assistance Agreement and is fully entitled to enforce its provisions and to be awarded damages for its breach.

In response to the plaintiffs' reliance on CTX's standing as a party to the Assistance Agreement, the government makes two arguments. First, it contends that CTX was not damaged by the enactment of the Guarini amendment because it had no taxable income to shelter during the pertinent periods. Second, it argues that CTX retained its status as a separate taxable entity and therefore could not assert claims on behalf of the Centex Consolidated Group. Those arguments are unpersuasive. As a member of the Centex Consolidated Group, CTX was eligible to share its tax benefits with the Group, and it was severally liable for the Group's tax liabilities. See 26 U.S.C. § 1501; Treas. Reg. § 1.1501-6(a); Int'l Tel. & Tel. Corp. v. United States, 608 F.2d 462, 474-75 (Ct. Cl. 1979); Turnbull, Inc. v. Comm'r, 373 F.2d 91, 94 (5th Cir. 1967); Home Group, Inc. v. Comm'r, 92 T.C. 940, 942 (1989); Andrew J. Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns § 14.05 (2d ed. 2004). While it is true that CTX retained its status as a separate taxable entity, CTX was nonetheless a member of the Centex Consolidated Group that consented to the filing of a consolidated tax return. As a consequence, it enjoyed the benefits and was subject to the liabilities flowing from the consolidation of the tax accounts of the various affiliated entities. See Helvering v. Morgan's, Inc., 293 U.S. 121, 127 (1934). CTX was therefore in a position to benefit, through the reduction of the Consolidated Group's tax liability, from deductions that would reduce the Consolidated Group's taxable income. For that reason, CTX has a legal stake in the question whether the Consolidated Group was

entitled to the tax benefits that were assertedly revoked by the Guarini amendment. We therefore reject the government's argument that neither plaintiff has standing to sue for breach of contract.

III

On the merits, the government makes four arguments, the first of which is that Centex Corporation and CTX were never legally entitled to the tax benefits they claimed as a result of the thrift acquisitions. In particular, the government argues that under the statutory scheme that was in place at the time of the Assistance Agreement, acquiring institutions were not legally entitled to deduct the built-in losses attributable to the acquired thrifts, because those losses were reimbursed by FSLIC. Therefore, the government contends, the Guarini amendment simply confirmed the disallowance of deductions that were never statutorily authorized in the first place. For that reason, according to the government, the Guarini amendment did not deprive the plaintiffs of any benefits to which they were previously entitled, and the enactment of the Guarini amendment therefore could not have resulted in any legally cognizable injury to the plaintiffs. In order to determine whether the plaintiffs were entitled to the tax benefits that were disallowed by the Guarini amendment, we must examine in detail the tax provisions that applied to FSLIC-assisted thrift acquisitions at the time of the Centex transaction.

A

In 1978, Congress gave FSLIC authority to provide several types of financial benefits to facilitate the merger or consolidation of endangered federally ensured thrifts with other financial institutions. Pub. L. No. 95-630, § 105(b)(2), 92 Stat. 3641, 3647

(1978), as amended by Pub. L. No. 97-320, § 122, 96 Stat. 1469, 1480 (1982). FSLIC was authorized to purchase the assets or assume the liabilities of troubled thrifts, 12 U.S.C. § 1729(f)(2)(A)(i) (1982), to make loans or contributions to the acquiring institutions, id. § 1729(f)(2)(A)(ii), and to guarantee the acquiring institutions against loss by reason of the merger or the assumption of the liabilities and purchase of the assets of the troubled thrifts, id. § 1729(f)(2)(A)(iii).

Three years later, Congress amended the Internal Revenue Code to provide tax benefits for institutions engaging in FSLIC-sponsored mergers and consolidations, thereby assisting the federal regulatory agencies in their efforts to address the savings and loan crisis. The new provisions, which were enacted as part of the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172, changed the tax laws in several related ways. First, they amended sections 368 and 382 of the Code, 26 U.S.C. §§ 368, 382 (1982), to allow a FSLIC-assisted transfer of a failing thrift to be treated as a tax-free reorganization. See 26 U.S.C. § 368(a)(3)(D) (1982). These amendments allowed certain potential tax advantages of the acquired institutions, such as net operating losses and built-in asset value losses, to be made available to the acquiring institutions. See 26 U.S.C. § 381 (1982). In particular, the treatment of FSLIC-assisted transfers as tax-free reorganizations meant that the tax basis of the transferred assets would remain "the same as it would be in the hands of the transferor." 26 U.S.C. § 362(b) (1982).

The 1981 statute also amended the tax laws as applied to FSLIC assistance payments. Prior to the 1981 statute, a payment to a corporate taxpayer did not constitute gross income if the payment qualified as a "contribution to the capital of the

[corporate] taxpayer." 26 U.S.C. § 118 (1982); see United States v. Chicago, Burlington & Quincy R.R., 412 U.S. 401 (1973). In the case of a nonshareholder contribution to the corporation's capital, however, the Code provided that the recipient corporation had to reduce the basis of its property by the amount of the contribution. 26 U.S.C. § 362(c) (1982).

As part of the 1981 statute, Congress altered that scheme in the case of FSLIC-assisted acquisitions by adding section 597 to the Internal Revenue Code. Subsection (a) of section 597 provided that assistance payments to acquiring institutions in FSLIC-assisted transactions would not be treated as gross income to the acquiring institutions, see 26 U.S.C. § 597(a) (1982), and subsection (b) provided that FSLIC assistance payments would not reduce the basis of the acquired assets, see id. § 597(b). Section 597 thus had the effect of ensuring that FSLIC assistance payments would never be taxed, either immediately or subsequently: Section 597(a) ensured that a FSLIC assistance payment would not be immediately taxable, because it would not be included in gross income, while section 597(b) ensured that the assistance payment would not be taxed at a later point, because the provision barring the reduction of basis of the acquired assets meant that the assistance payment would not result in taxable income when those assets were sold. See Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Act of 1981, at 151 (1981).

Although the 1981 statute ensured that FSLIC contributions would not be added to the recipient's gross income and would not affect the basis of the acquired assets, it did not expressly address the circumstances under which built-in losses in the assets of the acquired institutions could be deducted by the acquiring institutions. The trial court

acknowledged that none of the applicable Code provisions added in 1981 expressly permitted the Centex Consolidated Group to take any deductions. The court, however, found that collectively those provisions put the Consolidated Group in a position to take advantage of the built-in loss deductions under sections 165, 166, and 593. Moreover, the court concluded that by ensuring that the FSLIC assistance payments would not result in a reduction in the basis of the acquired assets, Congress manifested an intention to make the built-in loss deductions available to the acquiring institutions. The outcome of this case depends largely on the merits of the government's challenge to that conclusion, to which we now turn.

B

The government argues that the trial court erred in ruling that the difference between the basis of the covered assets and the amount actually recovered upon the disposition or write-down of those assets constituted a deductible loss for purposes of sections 165, 166, and 593. Because the FSLIC assistance payments to Texas Trust were equal in amount to the built-in losses on the covered assets, the government contends that the plaintiffs were compensated for any loss upon the disposition or write-down of those assets and thus could not properly treat such losses as deductible.

The government points out that at the time of the Centex transaction, there was no explicit statutory provision addressing the question whether an acquiring institution in a FSLIC-assisted transaction had the right to take a deduction for reimbursed built-in losses. Relying on the ordinary rule that a loss deduction may not be taken in the absence of actual economic loss, see Shoenberg v. Comm'r, 77 F.2d 446 (8th Cir. 1935), the government argues that the position taken by the plaintiffs is contrary to

longstanding principles of tax law. Thus, the government argues that a claimed loss normally cannot constitute a loss for tax purposes unless "when the entire transaction is concluded the taxpayer is poorer to the extent of the loss claimed; in other words, he has much less than before." Id. at 449.

That rule accurately states the general principle applicable to deductible losses. Thus, payments that are designed to reimburse a taxpayer for an expense or loss may bar the taxpayer from claiming a deduction for that expense or loss. See Manocchio v. Comm'r, 710 F.2d 1400, 1402 (9th Cir. 1983). That is because, in the case of a loss, a payment following the disposition of a covered asset may be regarded as compensation for the loss. As such, the payment may render the loss nondeductible based on section 165(a), which does not allow a deduction for a loss that is "compensated for by insurance or otherwise," or the payment may be regarded as part of the "amount realized" upon the disposition of the asset in question, see 26 U.S.C. § 1001; Ritter v. United States, 393 F.2d 823, 830-32 (Ct. Cl. 1968). The compensatory payments in such cases may disable the recipient from taking a loss deduction, even if the payments themselves are not includible in gross income. See Rev. Rul. 76-144, 1976-1 C.B. 17; Rev. Rul. 131, 1953-2 C.B. 112. With respect to bad debt losses or additions to a bad debt reserve, financial arrangements that secure the creditor against loss may render those debt-related losses nondeductible under sections 166 and 593. See Thompson v. Comm'r, 761 F.2d 259, 264 (6th Cir. 1985) (enforceable obligation of guarantor on debt owed to the taxpayer bars the taxpayer from deducting the debt as a loss or addition to bad debt reserve); Exxon Corp. v. United States, 7 Cl. Ct. 347, 357 n.13 (1985) (it would be an "anomalous result that a taxpayer would be entitled to a bad debt deduction even

though it had recourse to adequate collateral or to a fully solvent guarantor"), <u>rev'd on other grounds</u>, 785 F.2d 277 (Fed. Cir. 1985).

While the general principles that apply to the deductibility of losses and bad debts would normally bar the recipient of reimbursement payments from deducting asset value losses and bad debt reserve increases that are covered by those payments, it is far from clear that those general principles apply to the deduction of built-in losses in FSLIC-assisted acquisitions. General principles do not necessarily answer the question of deductibility in that setting, because Congress legislated with great particularity during the 1980s on the subject of the tax consequences of FSLIC-assisted acquisitions and created special tax rules for that narrow class of transactions. In fact, at the time of the transaction at issue in this case, as we discuss in detail below, it was widely assumed by tax professionals both within and outside the government that the general principles regarding the deductibility of losses and bad debts did not apply to FSLIC-assisted transactions, and that taxpayers in such transactions were eligible for the double benefit of receiving untaxed assistance payments and deducting the built-in asset losses to which the assistance payments related. Although the question of the deductibility of the built-in losses was not litigated prior to the enactment of the Guarini amendment, the courts that have addressed the question since then, including another court of appeals in dictum and the Court of Federal Claims in several cases similar to this one, have all concluded that the built-in losses on covered assets were deductible even when the FSLIC assistance payments had the effect of reimbursing the acquiring thrifts for their built-in covered asset losses. See <u>Fed. Deposit Ins. Corp. v. First Heights Bank, FSB</u>, 229 F.3d 528, 533 (6th Cir. 2000); <u>Nat'l Austl. Bank v. United</u>

<u>States</u>, 55 Fed. Cl. 782, 790 (2003); <u>Coast-To-Coast Fin. Corp. v. United States</u>, 52 Fed. Cl. 352, 361-62 (2002); <u>Local Am. Bank v. United States</u>, 52 Fed. Cl. 184, 189-90 (2002); <u>First Heights Bank, FSB v. United States</u>, 51 Fed. Cl. 659, 666 (2001); <u>First Nationwide Bank v. United States</u>, 49 Fed. Cl. 750, 755 (2001).

For the reasons set forth in detail below, we agree with the prevailing interpretation of the tax statutes applicable to FSLIC assistance payments, and we reject the government's submission that this case can be resolved simply by applying the general rule that reimbursed losses do not give rise to the right to take a deduction. In order to determine whether and to what extent that general rule applies to FSLIC-assisted transactions of the sort at issue in this case, we have found it necessary to examine the relevant statutory provisions in some detail.  After a close examination of the series of statutory provisions enacted in the 1980s and early 1990s that specifically addressed FSLIC-assisted acquisitions, we agree with the trial court that, prior to the enactment of the Guarini amendment in 1993, Congress allowed built-in losses to be deducted even though they were offset by FSLIC assistance payments.

C

The trial court concluded that to treat FSLIC assistance payments as negating the built-in covered asset losses would mean that the tax-exempt status of the payments, which Congress intended to be permanent, would not be permanent at all. As the trial court explained, to treat an assistance payment as reducing the deductible loss on a covered asset at the time of its disposition would in effect reduce the basis of the asset by the amount of the payment, thereby making the tax-exempt status of the payments temporary rather than permanent.  Accordingly, the trial court concluded that

when Congress enacted the 1981 legislation it must have intended for the built-in losses to be deductible even when the losses were offset by assistance payments from FSLIC.

The government offers two responses to the trial court's analysis of the 1981 statute. First, the government asserts that deductions are a matter of legislative grace and that taxpayers may take deductions only when Congress explicitly creates a deduction. See INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84 (1992) (deductions are "strictly construed and allowed only as there is a clear provision therefore"); Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Because the 1981 statute did not explicitly refer to the right to deduct built-in losses on covered assets when such losses were offset by FSLIC assistance payments, the government argues that the right to such a deduction was not clear. Second, the government argues that accepting its position regarding the offsetting effect of the assistance payments on the deductibility of the built-in losses would not render section 597 pointless, as the trial court concluded, because the statute's preservation of a high basis for those assets, even though not generating a deductible loss, would have the benefit of reducing any potential taxable gain from the sale of the assets.

We reject the government's arguments regarding the 1981 statute for several reasons. Contrary to the government's contention, the absence of a statutory provision expressly entitling acquiring institutions to deduct built-in losses does not disqualify the plaintiffs from entitlement to a deduction if the congressional purpose to create a deduction is sufficiently clear. As the Supreme Court has explained, even if a loss deduction is not supported by express statutory language, it can nonetheless be

recognized if it is "in harmony with the statute as an organic whole." United States v. Foster Lumber Co., 429 U.S. 32, 42 (1976), quoting Lewyt Corp. v. Comm'r, 349 U.S. 237, 240 (1955). In this case, even in the absence of an express provision for deducting built-in losses, the structure and purpose of the 1981 statute require that it be construed to permit the deduction.

We agree with the plaintiffs that the effect of denying a deduction for built-in losses would be to negate the benefits accorded by the 1981 version of section 597(b), which provided that the receipt of FSLIC assistance payments did not reduce the basis of the recipient's assets. Because the amount of FSLIC assistance paid when a covered asset was sold or written down was exactly equal to the amount of the loss on the asset, the only tax benefit of preserving the pre-acquisition basis of the asset in such a transaction was to enable the acquirer to deduct the difference between the basis and the sale price or written-down value of the asset as a loss. The government acknowledges that "[t]he exclusion from gross income granted by Section 597(a) is permanent, and not merely a temporary exclusion or deferral of the type that would be afforded if FSLIC assistance were treated as a nonshareholder contribution to capital under Section 118." Yet if the deduction of built-in losses were not allowed, the effect on taxpayers such as the plaintiffs would be the same as taxing the FSLIC assistance payment on a deferred basis.

An example illustrates this point. Suppose an acquiring institution in a FSLIC-assisted transaction obtains from an acquired thrift a covered asset with a basis of $100 but a value of only $70. Because the transaction is treated as a tax-free reorganization, the basis of the covered asset would remain $100 in the hands of the acquiring

institution, i.e., the acquiring institution would obtain a built-in loss on the asset of $30. Suppose further that, following the FSLIC-assisted acquisition, the covered asset is sold for $70. Pursuant to an assistance agreement equal in amount to the losses on covered assets, FSLIC would make a payment of $30 to the acquiring institution to make up for the built-in loss. Under section 597(a), the assistance payment would not be taxed, and under section 597(b), the basis of the asset would remain at $100. The government's argument is that the $30 assistance payment would render the $30 built-in loss nondeductible, even though there would still be a $30 difference between the basis of the asset and its sale value. Yet if the government's argument were correct, the tax-free nature of the $30 assistance payment conferred by section 597(a) would be offset by the elimination of the $30 deduction for the covered asset loss. That is, the assistance payment, although "non-taxed," would have the effect of depriving the acquiring institution of its right to deduct the built-in loss on the covered asset. For acquiring institutions like Centex, the government's position would result in an increase in tax liability that would entirely negate the tax benefit guaranteed by section 597(a). In addition, assuming the acquiring institution had other taxable income, it would obtain no tax benefit from section 597(b), because the loss of the right to a deduction would render the amount of the basis of the covered asset irrelevant. Thus, the structure of section 597 makes clear that if the statute is to provide permanent relief from taxation of a FSLIC assistance payment such as the one at issue in this case, the built-in losses on the covered assets must be deductible even when the assistance payment made to the acquiring institution is equal in amount to the built-in loss.

The government suggests that the guarantee against the reduction of basis on account of FSLIC assistance payments could have had some benefit other than preserving the acquiring institution's right to deduct built-in losses, and thus Congress could have had some other tax benefit in mind when it enacted section 597(b). According to the government, the preservation of basis would mean that "if a covered asset was sold for an amount in excess of its fair market value, but less than the basis that it had at the time of acquisition, Centex would not have to recognize a taxable gain." That argument is not persuasive, however, because the amount of each FSLIC assistance payment in a FSLIC-assisted acquisition such as the Centex transaction was dictated by the sale price of each covered asset or its value when written down. Thus, but for section 597(b), the basis would drop to the sales price and there would be no taxable gain. And if the asset were sold for more than the original basis of the asset in the hands of the acquired institution, there would be no FSLIC assistance payment and therefore no downward adjustment in basis even absent section 597(b). Contrary to the government's contention, the preservation of the basis of the built-in losses ensured by section 597(b) would not in any event reduce the taxable gain on the sale of the covered asset and therefore would not impart that tax benefit to the acquiring institution.

What this analysis suggests is that when Congress in 12 U.S.C. § 1729(f) (1982) authorized FSLIC to make assistance payments to acquiring institutions to induce them to take on the liabilities of failing thrifts, and when Congress in 26 U.S.C. § 597 (1982) ensured that such assistance payments would not be taxed, it did not intend that the extent of the tax benefits would depend—and potentially be substantially reduced—by the particular form in which the assistance payments were made. In section 1729(f),

Congress authorized assistance payments to be made in one of two forms: either as a fixed contribution to the acquiring institution or as a guarantee to the acquiring institution against loss by reason of the acquisition. Under the government's theory, however, only one of those forms of assistance payments would remain untaxed and not destroy the deductibility of the built-in losses on the acquired institution's assets. That is, as long as the amount of the assistance payment was fixed in advance, the assistance payment would be untaxed and the built-in losses from the acquired institutions would remain available to the acquiring institution. But if the assistance payment was calculated by reference to the net loss experienced on particular covered assets, the government's theory would deprive the acquiring institution of its right to deduct the built-in losses from the acquired thrift. We think it highly unlikely that Congress intended explicitly to create a tax-free incentive for acquiring institutions but implicitly to withdraw that benefit depending on how the parties structured the assistance payment.

Beyond the structure and effect of the 1981 statute, the plaintiffs' argument regarding the deductibility of built-in losses finds compelling support in the entire course of the federal government's subsequent treatment of FSLIC acquisitions between the 1981 statute and the Guarini amendment. Accordingly, we now turn to the post-1981 treatment of the built-in loss deduction issue.

D

From a close examination of the series of statutory enactments between 1986 and 1989, it is clear that throughout that period Congress understood that acquiring institutions in FSLIC-assisted transactions were eligible to take deductions for the built-in losses of the acquired institutions in the case of transactions completed before

January 1, 1989. Moreover, the regulatory agencies—the FHLBB and FSLIC—actively promoted the availability of such deductions in the course of their efforts to find financial institutions that were willing to acquire the failing thrifts. As FSLIC explained to Congress on several occasions, the availability of the built-in loss deductions saved FSLIC money by enabling it to arrange such transactions with lower expenditures from its own funds. In effect, part of the cost of the transactions was shifted from FSLIC to the general revenues of the United States through built-in loss deductions that would lower the acquiring institution's tax liability. Finally, examination of the sequence of events from 1986 through 1989 illustrates that the Internal Revenue Service fully understood that the acquiring institutions were enjoying that benefit, and that the Treasury Department and the Internal Revenue Service did not call a halt to the practice until well after the transaction at issue in this case had closed.

### 1. The Tax Reform Act of 1986

Five years after the enactment of the 1981 statute, Congress revisited the issue of tax benefits for acquiring institutions in FSLIC-assisted acquisitions. Based on concern that the 1981 statute provided unduly favorable tax treatment to acquiring institutions, Congress took steps, in the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, to terminate that favorable tax treatment prospectively for transactions closing after December 31, 1988. Congress did so by repealing section 597 for all post-1988 transactions. A contemporaneous explanation of the 1986 amendments to the FSLIC-assistance tax provisions indicates that Congress was concerned that the tax benefits to acquiring institutions provided by the 1981 statutes were inconsistent with the normal tax rules that would otherwise apply to such transactions and were unduly

generous.  See Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1986, at 571 (1987).

As part of the 1986 statute, Congress imposed restrictions on the extent to which net operating losses and built-in losses could be utilized by corporations following an ownership change.  See Tax Reform Act of 1986, Pub. L. No. 99-514, § 621, 100 Stat. 2085, 2254.  Significantly, the 1986 Congress specifically exempted FSLIC-assisted transactions from the new limitations on the use of built-in losses of the acquired corporations for transactions closing before January 1, 1989.  See id., 100 Stat. at 2264, codified at 26 U.S.C. § 382(*l*)(5)(F).  Congress's care to ensure the continued availability of built-in loss deductions in FSLIC-assisted transactions during the transition period indicates that Congress understood that those deductions were being taken by acquiring institutions even though the acquiring institutions were receiving assistance payments equal to the loss on the covered assets when they were sold or written down.

In the same year, the Internal Revenue Service issued Technical Advice Memorandum No. 8637005, in which the Service agreed that an acquirer of an insolvent thrift "may deduct expenses and losses, reimbursed with contributions from FSLIC that are tax exempt under section 597(a) of the Code."  Although the Technical Advice Memorandum was not accorded precedential status or regarded as binding on the Service, it nonetheless serves as a clear indicator that the Service regarded built-in losses as deductible, even when offset by assistance payments from FSLIC. Significantly, the Service ruled that built-in loss deductions were available in FSLIC-assisted transactions, even in the face of the principle that the right to a deduction

normally must be clear and explicit, and notwithstanding the general rule against recognizing deductions for losses that do not reflect actual economic loss.

Nor was the Internal Revenue Service alone in its understanding of the effect of the 1981 statute. In materials used to solicit participants for the acquisition transactions, the FHLBB and FSLIC actively promoted the availability of deductions of built-in losses even when those losses were offset by FSLIC assistance payments. In their publication entitled Information and Instructions for the Preparation and Submission of Proposals, the FHLBB and FSLIC advised prospective purchasers that acquiring institutions were entitled to deduct the built-in losses of the acquired institutions' covered assets, even when those losses were reimbursed through FSLIC assistance payments.

Similarly, in its 1987 Annual Report, the FHLBB wrote that "special provisions in the Internal Revenue Code's corporate reorganization rules clarify that a FSLIC-supervised merger or acquisition can qualify as a tax-free reorganization, such that the net operating and built-in tax losses of the troubled institution can be fully utilized by the acquiring institution." FHLBB, 1987 Annual Report 15. The report added that "although the nominal benefit of this provision accrues to the acquiring institution, in a very real sense the benefit assists FSLIC because contractual agreements between it and the acquirer require that tax benefits enjoyed by the acquiring institution must be accounted for and rebated to FSLIC." Id.

### 2. The Technical and Miscellaneous Revenue Act of 1988

In 1988, Congress again amended section 597. See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3342. In that Act, Congress delayed the repeal of section 597 for another year, but at the same time it

reduced the benefits provided by section 597 for transactions executed during that one-year period. In particular, the statute amended section 597 to add section 597(c), which provided for the reduction of certain "tax attributes" by 50 percent of the amount excludable from gross income pursuant to section 597(a). The three "tax attributes" that were statutorily reduced by section 597(c) were the deduction of net operating losses, the deduction of allowable interest, and the deduction of "recognized built-in portfolio losses for the taxable year." Pub. L. No. 100-647, 102 Stat. at 3657.

The statute's reference to "built-in portfolio losses" demonstrates that Congress regarded the deduction of built-in losses as a tax benefit that acquiring institutions enjoyed under the 1981 statute. If Congress did not regard built-in portfolio losses as deductible, it would be very difficult to understand the portion of section 597(c) providing that the "tax attributes" of "recognized built-in portfolio losses" would be reduced by 50 percent for FSLIC-assisted transactions during 1989.

The government attempts to explain the 1988 statute, consistently with its "no deduction" theory, by suggesting that the statutory reference to "built-in portfolio losses" may pertain to built-in losses on assets other than covered assets. For that reason, the government argues, the 1988 statute does not prove that Congress considered the deduction of built-in losses on covered assets to go hand-in-hand with the non-inclusion of assistance payments in gross income (section 597(a)) and the non-reduction in the basis of those assets due to the payments (section 597(b)). That argument, however, is contrary to the explanation of the 1988 amendment to section 597 that was provided in the Conference Report on that legislation. The Conference Report explained that the 50 percent reduction in tax attributes applied to "payments under guarantees against

loss on certain assets." H.R. Conf. Rep. No. 100-1104, pt. 2, at 93 (1988). It further explained that the "tax-free treatment of assistance payments" was being extended for a year, but that there was a 50 percent "cutback of attributes with respect to such tax-free payments." Id. at 94. Taken together, those statements show that the "tax attributes" that Congress regarded as being available to acquiring institutions under section 597 included deductions for built-in losses on covered assets in FSLIC-assisted acquisitions.

Furthermore, the materials submitted in support of the 1988 legislation explicitly acknowledged that the deductibility of built-in losses was one of the tax attributes enjoyed by acquiring institutions, even when those institutions were receiving FSLIC payments in the amount of those losses. In urging the enactment of the 1988 legislation, FSLIC's chairman explained to the Senate Finance Committee that "special provisions in the tax code's corporation reorganization rules clarify that a FSLIC-supervised merger or acquisition can qualify as a tax-free reorganization and that the net operating losses and built-in tax losses of the troubled institution can be fully utilized by the acquiring institution." Expiring Tax Provisions: Hearing Before the Subcomm. on Taxation and Debt Management of the Senate Comm. on Finance, 100th Cong. 255 (1988). He added that, "although the incidence of these tax benefits is with the acquiring institution, the real benefit inures to FSLIC through contractual agreements requiring that tax benefits enjoyed by the acquiring institution must be accounted for and rebated back to the FSLIC." Id.; see also id. at 262-63 (the fact that "the transferor's basis carries over to the surviving institution allows that institution to recognize a tax loss if the asset is sold or satisfied at less than its basis"). Thus, the proponents of the 1988 legislation made clear their understanding that the consequence of extending

section 597 would be to continue permitting acquiring institutions in FSLIC-assisted transactions to deduct built-in covered asset losses despite their receipt of assistance payments from FSLIC.

Because the full benefits of section 597 were scheduled to end as of December 31, 1988, many acquisition transactions, including the Centex transaction, were completed in late December of 1988 before the expiration of the favorable tax treatment for such transactions. The December 1988 transactions were widely reported in the press and were frequently characterized as being unduly favorable to the acquiring institutions.

Within two weeks after the Centex transaction closed, the House Banking Committee conducted a hearing at which several members of Congress were highly critical of the entire set of acquisition transactions that were completed in December 1988. The committee chairman expressed dismay about the power of the FHLBB and FSLIC to "go behind closed doors, enter into deals with individuals and corporations, give away tax benefits, and commit the Federal Government to guarantees reaching long into the future." FSLIC Assistance Programs, Hearing Before the House Comm. on Banking, Finance and Urban Affairs, 101st Cong. 3 (1989). Other members of the committee made even stronger statements, many of which focused on the tax benefits that were understood to flow from the acquisition transactions. See id. at 7 ("the Bank Board's year-end rush to allow troubled thrifts to take multi-million-dollar tax write-offs represents backdoor raids. It amounts to a societal decision to allow those with large tax liabilities, for example, the rich, to get richer. . . . [The transactions] call for small infusions of capital while allowing massive tax avoidance.") (statement of Rep. Leach);

id. at 9 ("Had the Bank Board let it be widely known that they were selling $1 billion worth of tax breaks for $300 million in cash, it could surely have billed this as the biggest fire sale in history.") (statement of Rep. Schumer); id. at 12-13 ("Basically for that no-risk venture, they are getting a whole bunch of tax write-offs and no-loss guarantees from the Federal Government.  I think this activity has to stop.") (statement of Mr. Kleczka); id. at 13 ("In some of the deals, the Bank Board has given guarantees that the investors will not lose any money, which digs us in deeper.  The tax breaks added to the frosting on the cake.") (statement of Mr. Roth); id. at 14 ("I am particularly outraged, as I think the editorials throughout the country have indicated, we are more or less printing money, promissory notes and asking Congress to subsidize some of the large deals that are being made today.") (statement of Rep. Guarini).

The various comments made by legislators, administrators, and other public officials at the time make clear that it was understood that the acquiring institutions in FSLIC-assisted acquisitions were entitled to obtain deductions for the built-in losses on the assets of the acquired thrifts.  Thus, for example, in a statement to the House Ways and Means Committee in early 1989, the Comptroller General, while criticizing the statutory provisions that made built-in losses deductible, nonetheless acknowledged that "special provisions in the Internal Revenue Code" ensured that those deductions were available to acquiring institutions:

> The rules also enable the new thrift to carry over the full value of assets from the acquired thrift.  Because this value is generally higher than the fair market value, there is a loss when the assets are sold.  This "built-in" loss is deductible against the new thrift's income and may also be used to offset income of a holding company which owns the thrift.

Budget Implications and Current Tax Rules Relating to Troubled Savings and Loan Institutions: Hearings Before the House Comm. on Ways and Means, 101st Cong. 47 (1989); see also id. at 78, 212, 354. The Congressional Budget Office likewise recognized the availability of deductions for built-in losses under existing law, although it criticized the availability of those deductions as creating "perverse incentives," and recommended their abolition. Id. at 246-48. Similarly, the Joint Committee on Taxation recognized that under the statutory and regulatory scheme then in effect built-in losses on covered assets were deductible in FSLIC-assisted transactions, although the Joint Committee was careful to characterize that rule as "the present administrative approach taken by the IRS." That qualification was perhaps understandable in light of the sharp congressional criticism that had so recently been directed at the availability of those deductions. Joint Committee on Taxation, Current Tax Rules Relating to Financially Troubled Savings & Loan Institutions 32, 37-38 (Feb. 16, 1989).

### 3. FIRREA

In early 1989, legislation was proposed to eliminate altogether the tax deduction for built-in losses in FSLIC-assisted acquisition transactions. See 135 Cong. Rec. 3811 (1989). Later that year, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, 548-50. In that statute Congress revisited section 597, and once again it took action from which it is fair to infer that Congress understood the pre-1989 version of section 597 to permit deductions for built-in losses in FSLIC-assisted transactions.

As part of FIRREA, Congress revised section 597 for transactions closing after December 31, 1989. In place of former section 597, Congress provided that the tax

treatment of federally assisted transactions would be determined by regulations to be promulgated by the Secretary of the Treasury, and that "[n]o regulations prescribed under this section shall permit the utilization of any deduction (or other tax benefit) if such amount was in effect reimbursed by nontaxable Federal financial assistance." FIRREA § 1401(a), 103 Stat. at 549. The inclusion of an express statutory prohibition on allowing deductions for losses reimbursed by federal assistance indicates that Congress regarded the pre-FIRREA regime as allowing such deductions. The legislative history of FIRREA supports that interpretation, as it shows that Congress interpreted the prior law (including the law applicable to the transaction at issue in this case) as permitting deductions for built-in losses. Thus, in the description of "present law," the House report on FIRREA explained that the general limitations on the use of built-in losses are relaxed in the case of FSLIC-assisted acquisitions. H.R. Rep. No. 101-54, pt. 2, at 24 (1989). The report concluded that the "tax subsidy provided to financially troubled financial institutions through more favorable tax rules than those applicable to other taxpayers" is "an inefficient way to provide assistance to such institutions," and it endorsed the abolition of "indirect assistance through the tax system," id. at 25, which Congress adopted for all post-1988 transactions.

### 4. The Guarini Amendment

A year after Congress enacted FIRREA, the newly formed Resolution Trust Corporation ("RTC"), which was responsible for reducing the cost of the savings and loan crisis to the government, published a lengthy report that examined the costs of the 1988 FSLIC assistance agreements and made suggestions about how those costs could be reduced. The RTC report, which was mandated by FIRREA, acknowledged

that "[l]osses due to the disposal or write-down of covered assets are generally tax deductible [by the acquiring institution], while the reimbursement for losses and write-downs by FSLIC is not taxable to the institution." Resolution Trust Corporation, <u>Report to the Oversight Board of the Resolution Trust Corporation and the Congress on the 1988/89 Federal Savings and Loan Insurance Corporation Assistance Agreements</u> 35 (Sept. 18, 1990). Because "the assistance was tax-free," the RTC report explained, "the tax benefit of the built-in losses is generally assumed to be retained for tax purposes. As a result, an acquirer is compensated, tax free, for the loss in value of the assets, and still retains a tax deduction for such depreciation." <u>Id.</u> at 46. The report added, however, that a law firm memorandum commissioned by the RTC had concluded that there is doubt whether the "widely held perception of the applicable tax law—as allowing the realization of a tax loss when the holder of a covered asset is fully compensated for any shortfall between the amount received upon disposition and the asset's tax basis" was correct. The RTC accordingly recommended that Congress and the Internal Revenue Service "review the area of law . . . and consider clarifying the issue as necessary." <u>Id.</u> at 117-18.

A Senate Committee hearing on the RTC report focused on measures that could reduce the costs of the 1988/1989 FSLIC assistance agreements. RTC Chairman L. William Seidman identified various cost-saving measures, noting that "cost reductions . . . may be secured by a change in the current interpretation of the tax treatment of the deductibility of built-in losses." <u>RTC Report on FSLIC's 1988-89 Assistance Agreements: Hearing Before the Senate Comm. on Banking, Housing, and Urban Affairs</u>, 101st Cong. 10 (1990). By disallowing such deductions, he explained, "the

savings to the Government could be significant." Id. Senator Kassebaum asked Chairman Seidman about the cost reductions that could be obtained "by a change in the current interpretation of the tax treatment of the deductibility of built-in losses," in light of the "deals that were rapidly struck at the end of 1988 in order to take advantage of the deductibility for tax purposes." Id. at 32. Chairman Seidman responded that the savings from such a change would be in the billions, but he acknowledged that "there's a real question about whether the Government is in a position to effect that kind of a tax ruling based on the past negotiations that they had." Id. at 33. Senator Kassebaum agreed with that assessment, stating that "I'm sure there would be some real concerns if we could go back and legally undo that." Id.

In response to the RTC's invitation, the Treasury Department addressed the question of the availability of built-in loss deductions to acquiring institutions that had entered assistance agreements with FSLIC and were continuing to receive assistance payments relating to covered asset losses. In an internal memorandum, the Deputy Assistant Secretary for Tax Policy noted that in light of the Internal Revenue Service's 1986 private ruling and its informal assurance to both FSLIC and potential acquirers that covered asset losses would be deductible, "there should be no doubt that denying financial institutions deductions for losses and expenses that are reimbursed by the FDIC will be perceived by many as a repudiation of the government's bargain." Michael J. Graetz, Tax Aspects of 1988/89 FSLIC Transactions, at 3-4 (Dec. 7, 1990). That memorandum addressed the possibility of denying deductions for covered losses and litigating the taxpayers' eligibility for those deductions under current law, but concluded that such litigation had "a relatively high prospect of taxpayer success." Id. at 5.

Notwithstanding those reservations, however, the Treasury Department in March 1991 advocated a legislative change that would abrogate the deductibility of built-in losses on covered assets when those losses were reimbursed by assistance payments. See Department of the Treasury, Report on Tax Issues Relating to the 1988/89 Federal Savings and Loan Insurance Corporation Assisted Transactions (Mar. 1991) ("1991 Treasury Report").

The Treasury Department report argued that "from the point of view of sound tax and financial policy, taking into account both the costs to the government and the appropriate economic incentives for assisted institutions," deductions should not be permitted for reimbursed losses in FSLIC-assisted transactions. 1991 Treasury Report at 15. The report acknowledged that the Internal Revenue Service had issued a technical advice memorandum stating that such covered asset losses were deductible, that "IRS personnel apparently conveyed informally both to FSLIC and to potential acquirers that covered losses and expenses would be deductible," that "[m]aterial provided by FSLIC to prospective acquirers explicitly indicated that such losses would be deductible," and that "acquirers in the 1988/89 transactions regard the deductibility of covered losses as part of the consideration they received in connection with the acquisition of the troubled financial institutions." Id. at 15-16. Nonetheless, after weighing "the costs to the government of allowing institutions to deduct reimbursed losses and expenses against the costs of creating a perception that the government is not adhering to its bargain," the Treasury Department recommended that Congress enact legislation barring those deductions. Id. at 16.

Two years later Congress followed Treasury's recommendation by enacting the Guarini amendment. Although Congress had already limited or eliminated covered-asset deductions for transactions entered into after January 1, 1989, this time it sought to affect deductions for transactions that closed prior to that period. The Guarini amendment, which was enacted in March 1993, was characterized as a "clarification" of the law governing the deductibility of reimbursed covered asset losses. Pub. L. No. 103-66, § 13224, 107 Stat. 485 (1993). Nonetheless, it was not made applicable to all such deductions in open tax years, but only to deductions taken after March 1991, when the Treasury Department formally announced its position urging corrective legislation on the matter.

Although it is true that neither the 1981 statute governing the tax benefits for acquiring institutions nor any of the subsequent amendments to that statute expressly conferred on acquiring institutions the right to deduct built-in losses, we conclude that it is impossible to read the sequence of enactments between 1981 and 1989 as reflecting any other congressional understanding. Furthermore, it is clear that both the Internal Revenue Service and FSLIC shared Congress's understanding. We therefore agree with the trial court that at the time of the transaction at issue in this case, it was reasonably well settled that such a deduction for built-in losses on covered assets was available to acquiring institutions under sections 165, 166, and 593, even when the acquiring institutions were receiving FSLIC assistance payments in the amount of the built-in losses. Making a deduction available in that situation may have been poor tax policy, in that it provided acquiring institutions a double benefit for the same loss while giving them an incentive to minimize the recovery of assets carrying built-in losses.

Notwithstanding the legitimate arguments that such a deduction was unwise, however, it is clear that the availability of the deduction was unchallenged as of late 1988, that it was touted as one of the incentives to parties to enter into acquisition transactions with FSLIC, and that it was material to the decision of the Centex Consolidated Group to acquire the four failing Texas thrifts. Although abrogating the deduction was no doubt very tempting because it combined good tax policy with the prospect of saving a substantial amount of tax revenue, the wisdom of the change does not gainsay the fact that it was a change. Thus, we hold that as of late 1988 acquiring institutions had the legal right to deduct the built-in losses of acquired thrifts in FSLIC-assisted transactions, even if those losses were offset by assistance payments from FSLIC.

IV

We next turn to the question whether Congress's retroactive abolition of the built-in loss deduction for acquiring institutions, which deprived the plaintiffs of a substantial part of the benefit of their contract with FSLIC, constituted a breach by the government of the implied covenant of good faith and fair dealing.

The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner. The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. Restatement (Second) of Contracts, § 205 (1981); 13 Richard A. Lord, Williston on Contracts § 38:15, at 437-38 (2000); M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990); Polito v. Continental Cas. Co., 689 F.2d 457, 463 (3d Cir. 1982); Concrete Specialties v. H.C. Smith Constr. Co., 423

F.2d 670 (10th Cir. 1970). The duty applies to the government just as it does to private parties. Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1330 (Fed. Cir. 2003); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); Malone v. United States, 849 F.2d 1441, 1445, modified, 857 F.2d 787 (Fed. Cir. 1988).

The trial court found that the plaintiffs reasonably regarded the availability of tax deductions for the built-in losses as an important part of the contract consideration and that they reasonably expected the government not to withhold that consideration by legislation specifically targeted at the contract. The court further found that the government breached the implied covenant of good faith and fair dealing when it enacted the Guarini amendment, which had the purpose and effect of depriving its contracting partners of a substantial measure of the fruits of the contract and appropriating those fruits, pro tanto, to itself.

In challenging the trial court's ruling that enactment of the Guarini amendment breached the implied covenant of good faith and fair dealing, the government makes four arguments. First, the government argues that neither the FHLBB nor FSLIC had the authority to promise that any tax deduction would continue to be available, and that upon entering a contract with the government, CTX and Texas Trust "assume[d] the risk of accurately determining that the entity purporting to act for the Government stays within the bounds of its authority." The simple answer to this argument is that while it is true that neither the FHLBB nor FSLIC could bind Congress with respect to the enactment of legislation, it is clear that they could make a binding promise to pay damages in the event that the tax laws were changed in a way that injured CTX and Texas Trust. The only difference between a breach of an express promise to pay

damages in the event of a change in the tax laws and the implied covenant at issue in this case is that the former is express and the latter is implied. The government agencies' authority to enter into such covenants is not relevant in distinguishing between the two cases.

The government's second argument in response to the trial court's ruling that the Guarini amendment was targeted at the plaintiffs' contract rights and thereby breached the implied covenant of good faith and fair dealing is to assert that the Guarini amendment was not targeted legislation. The plaintiffs correctly characterize that argument as frivolous. If the Guarini amendment was not targeted, no legislation is targeted. Indeed, the only way the Guarini amendment could have been more clearly targeted would have been for the statute to identify the affected FSLIC-assisted acquisition transactions by name. Short of that degree of specificity, the elements of targeting in the Guarini amendment are plain.

First, the statute was specifically addressed to a small number of transactions, consisting of the FSLIC acquisition agreements that provided direct assistance payments to acquiring institutions in the amount of the losses they realized on the covered assets they acquired from the failing thrifts. In testifying at the hearing on the bill that ultimately became the Guarini amendment, the Treasury Department representative referred to the "perverse incentives" resulting from allowing deductions for built-in losses in spite of FSLIC assistance payments, and she explained that the legislation was specifically targeted to eliminate that particular tax advantage in those already executed transactions: "Our legislation is vary narrowly drafted to reach only the transactions in which we believe these perverse incentives exist." <u>Tax Aspects of</u>

Government-Assisted Savings and Loan Acquisitions:  Hearing Before the House Comm. on Ways and Means, 102d Cong. 69 (1992).

Second, Congress was keenly aware of the tax benefit that the acquiring institutions were offered in the form of deductions of built-in losses on covered assets, and it legislated to eliminate that tax benefit retroactively so as to reduce what it regarded as the excessive costs of the late 1988 acquisition transactions.  As the Treasury Department acknowledged in proposing legislation to eliminate the deduction, "clarification of the tax treatment of FSLIC assistance will facilitate measures to renegotiate and reduce the cost of the 1988/89 FSLIC transactions."  Department of the Treasury, General Explanation of the President's Budget Proposals Affecting Receipts 95-96 (1992).

Third, the Guarini amendment was not part of a broader change in the Tax Code affecting taxpayers generally, but had its sole impact on particular contracts that Congress regarded as being unduly favorable to the acquiring institutions in light of the tax benefits made available by the 1981 legislation.  See H.R. Rep. No. 103-111, at 669 (1993).  Thus, far from being a broadly applicable change in the tax laws, the Guarini amendment was a legislative change of extremely narrow application:  It was directed at a small and specifically identified group of taxpayers having contracts with the government, and it was designed to reduce the cost of those contracts to the government by reducing the tax benefits that the transactions would provide to the acquiring institutions.  As such, the Guarini amendment was the paradigm of targeted tax legislation.

The government's next argument is that the implied covenant of good faith and fair dealing cannot be used to expand a party's contractual duties beyond those in its express contract.  See Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1998). In this case, however, the plaintiffs are not arguing for an expansion of the government's duties under the contract or for a duty that is inconsistent with some provision of the contract.  Instead, they are arguing that the government should be prohibited from interfering with the plaintiffs' enjoyment of the benefits contemplated by the contract, which is among the core functions served by the implied covenant of good faith and fair dealing.  The government suggests that if the parties had wished to ensure against the risk of a change in the tax laws, they could have included a clause providing for the payment of damages in that event.  While it is true that the parties could have included a clause specifically ensuring against legislation that destroyed the benefits of the contract, such covenants have not been required in the past to protect contracting parties against the risk of contract breaches by the government, see Winstar, 518 U.S. at 887 (plurality opinion) ("no need for an unmistakably clear 'second promise'"); id. at 921 (Scalia, J., concurring in the judgment) (no requirement "that there be a further promise not to go back on the promise" that is the subject of the suit), and the government has not offered any reason for us to conclude that such an express clause should be required in this instance.  Indeed, it would be inconsistent with the recognition of an implied covenant if we were to hold that the implied covenant of good faith and fair dealing could not be enforced in the absence of an express promise to pay damages in the event of conduct that would be contrary to the duty of good faith and fair dealing.

Finally, the government argues that the trial court's decision is contrary to the "unmistakability doctrine." As explained by the plurality in Winstar, the unmistakability doctrine is a doctrine of contract construction instructing that "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act, nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of a sovereign power." 518 U.S. at 878. Thus, the unmistakability doctrine provides that, absent a clear statement to the contrary, a contract entered into by a private party with the government will not be interpreted to exempt the private party from the operation of a subsequent sovereign act by the government. The government argues that, as applied in this case, the unmistakability doctrine means that the Assistance Agreement, which contained no express guarantee against abrogation of the built-in loss deduction in FSLIC-assisted transactions, cannot be read to exempt the plaintiffs from the effect of the Guarini amendment.

A prerequisite for invoking the unmistakability doctrine is that a sovereign act must be implicated. As the plurality opinion in Winstar noted, "[t]he application of the [unmistakability] doctrine . . . turns on whether enforcement of the contractual obligation would block the exercise of a sovereign power of the Government." 518 U.S. at 879. The plurality opinion added that legislation nullifying the government's obligations under one of its contracts "by abrogating the legal enforceability of that contract, or Government contracts of a class including that one, or simply all government contracts" would not constitute an exercise of sovereign power to which the unmistakability doctrine would apply. 518 U.S. at 879 n.22.

In addressing the government's argument in <u>Winstar</u> that the sovereign acts doctrine provided a separate defense against the breach of contract claim, the plurality opinion distinguished between acts of general legislation and acts that are more particularly directed at relieving the government of its contractual responsibilities. The plurality noted that the greater the government's self-interest, "the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence, and where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations, the defense will be unavailable." <u>Id</u>. at 898. In support of that proposition, the plurality cited several cases noting that the sovereign acts doctrine does not apply to "legislation targeting a class of contracts to which [the government] is a party." <u>Id.</u> at 898 n.45, quoting <u>Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp.</u>, 25 F.3d 1493, 1501 (10th Cir. 1994).

The <u>Winstar</u> plurality concluded that the sovereign acts doctrine was inapplicable in <u>Winstar</u> itself because it was clear that, in enacting FIRREA, Congress had focused on certain FSLIC-assisted acquisition contracts that it regarded as improvident. After a review of the background of the legislation, the plurality concluded that "the extent to which this reform relieved the Government of its own contractual obligations precludes a finding that the statute is a 'public and general' act for purposes of the sovereign acts doctrine." 518 U.S. at 903.

The concurring justices in <u>Winstar</u> took a different view of the unmistakability and sovereign acts doctrines, but their analysis does not suggest that they would reach a different result in a case such as this one. As Justice Scalia explained for the three

justices who concurred in the judgment in Winstar, the unmistakability doctrine is properly viewed as a "rule of presumed (or implied-in-fact) intent" that the sovereign "does not promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts." Winstar, 518 U.S. at 920-21 (Scalia, J., concurring in the judgment). Justice Scalia's opinion makes clear that his reference to "sovereign acts" that "incidentally" affect the contract rights of the government's contracting partner does not include legislation that is designed to repudiate the government's contract obligations. In the course of his opinion, Justice Scalia cited with approval the Court's earlier decisions in Lynch v. United States, 292 U.S. 571 (1934), and Perry v. United States, 294 U.S. 330 (1935), and noted that in those cases "Congress specifically set out to abrogate the essential bargain of the contracts at issue—and in both we declared such abrogation to amount to impermissible repudiation" that was not protected by either the unmistakability doctrine or the sovereign acts doctrine. 518 U.S. at 924.

In Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997), this court agreed with the proposition that the unmistakability doctrine is implicated only when the government acts in its sovereign capacity. We held in that case that the particular governmental acts at issue were not specifically targeted at the government's contracting partners. We based that holding on our conclusion that the tax at issue in that case did not reach "only those utility companies that previously had contracted with the government; it also reaches those utilities that purchased the services through the secondary market but had no contracts with the Government." 112 F.3d at 1576. Because the tax was legislation of general application, we held that it constituted the

exercise of a sovereign power and that the unmistakability doctrine was therefore applicable. Id. at 1579 ("[A]pplication of the unmistakability doctrine turns on whether enactment of the contractual obligation would effectively block the exercise of a sovereign power. As explained above, the enactment at issue in this case is a general, sovereign act."); see also Kimberly Assocs. v. United States, 261 F.3d 864, 869 (9th Cir. 2001) ("when the government is acting as a private contracting party, then the [unmistakability] doctrine does not apply"); Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp., 34 F.3d 982, 984 (10th Cir. 1994) (unmistakability defense stands or falls with the sovereign acts defense); Grass Valley Terrace v. United States, 51 Fed. Cl. 436, 440-43 (2002).

In this case, the trial court found that the enactment of the Guarini amendment, unlike the enactment of the legislation at issue in Yankee Atomic, did not implicate a sovereign power. Instead, the court found that the Guarini amendment was simply an effort by the government through legislation to adjust the costs of a discrete set of contracts into which a government agency had entered. An act that is specifically targeted at the fruits of contracts enjoyed by the government's contracting partners is not a sovereign act, the court ruled. The trial court first determined that "[f]or an act of Congress to qualify as an exercise of sovereign power, it cannot have been designed merely to eliminate an obligation that arose under one of the Government's contractual relationships." The court further found that appropriating the benefits of the contracts was the express purpose of the Guarini legislation, stating, "[h]ere, we have found, in light of the 'intense concern with contracts like the one[ ] before us,' that the 'substantial effect,' if not the only effect, of the Guarini legislation was to release the United States

from its obligations under the assistance agreements entered into with these plaintiffs and others similarly situated." In light of that finding, which is well supported by the record, the enactment of the Guarini amendment cannot be regarded as a sovereign act because it was not generally applicable legislation in form or substance, but was specifically targeted at appropriating the benefits of a government contract.

The government responds that whatever might be the case in other contexts, this case involves a uniquely sovereign act, namely, the right to tax, and that as a result the unmistakability doctrine should apply. The government asserts that the plaintiffs' expectation that they would be allowed to deduct built-in losses on the covered assets under the Assistance Agreement was unreasonable because Congress is always entitled to enact legislation changing the Internal Revenue Code and because any private entity, whether contracting with the government or otherwise, should expect that the tax laws may be changed at any time. In that setting, the government argues that the implied covenant of good faith and fair dealing, "even if it exists, is not sufficient under the unmistakability doctrine to constitute a surrender of Congress's power to tax."

As noted above, the government's assertion that a contract cannot preclude Congress from changing the tax laws does not fairly characterize the issue we are called on to decide. The question raised by this case is whether the government is liable in damages for breach of the contract when Congress enacts specifically targeted legislation that appropriates for the government a portion of the benefits previously available to the contractor. The Supreme Court's decision in Winstar establishes that while a contract may not interfere with Congress's power to enact tax legislation, the contract may nonetheless bind the government to pay damages in the event such

legislation is found to breach the contract. As the plurality opinion in <u>Winstar</u> noted, "[o]nce general jurisdiction to make an award against the government is conceded, a requirement to pay money supposes no surrender of sovereign power by a sovereign with the power to contract. . . . The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act." <u>Winstar</u>, 518 U.S. at 881, citing <u>Amino Bros. Co. v. United States</u>, 372 F.2d 485, 491 (Ct. Cl. 1967). Thus, a claim for damages arising from the breach of a contract by an act of Congress does not bar Congress from exercising its taxing power; it merely ensures that if the exercise of that power breaches a particular contractual obligation, the injured party will have redress for the breach. Based on that fundamental principle underlying <u>Winstar</u>, we reject the government's characterization of the claim for damages as a request to enjoin the enactment of legislation.

Pointing to two related passages in the plurality opinion in <u>Winstar</u>, the government argues that the Court in that case expressly excluded the power to tax from its analysis of the unmistakability doctrine. The government points to the <u>Winstar</u> plurality's statement that "[i]t would, of course, make good sense to apply the unmistakability rule if it were clear from the start that a contract plaintiff could not obtain the relief sought without effectively barring exercise of a sovereign power, as in the example of the promisee of the tax exemption who claims a rebate." 518 U.S. at 878. In addition, the government relies on the plurality's related statement that it would make good sense to apply the unmistakability rule if it was "clear from the start that a contract

plaintiff could not obtain the relief sought without effectively barring exercise of a sovereign power, as in the example of the promisee of the tax exemption who claims a rebate." <u>Winstar</u>, 518 U.S. at 880 n.24.

We do not interpret those passages from <u>Winstar</u> to suggest that the unmistakability doctrine automatically applies whenever an exercise of the government's power to tax is involved. The quoted references to the taxing power assumed that the particular legislation in question was an "exercise of a sovereign power," and thus was not the kind of targeted legislation that the <u>Winstar</u> Court treated as not constituting such an exercise. Thus, the quoted passages stand for the proposition that, in the absence of unmistakable contractual language to the contrary, general tax legislation would not give rise to contractual liability simply because the tax had an adverse impact on the government's contracting partners. That language cannot be stretched to mean that the government can avoid the obligations of its contracts by using its taxing power to appropriate back benefits that it has given up pursuant to contract. Indeed, if the language were read to immunize all forms of tax legislation in that manner, the decision in <u>Winstar</u> would be in tension with the Supreme Court's earlier decision in <u>Puerto Rico v. Russell & Co.</u>, 315 U.S. 610 (1942), in which the Court disapproved a legislative effort to recoup part of the costs of a contract with a private contractor by making annual assessments against the contractor, even though the legislation was denominated a "tax." Based on the history of the legislation at issue in that case, the Supreme Court concluded that the "proposed exaction was not a general tax" but was an effort to collect certain expenses from persons who were exempted from those expenses by contract.

In that setting, the Court found the imposition of the tax on the plaintiffs to be a "clear violation of the obligation of the contracts." 315 U.S. at 619.

The government makes a similar argument that our decision in Yankee Atomic stands for the proposition that an exercise of the power to tax is always the exercise of a sovereign power. In that case, however, we specifically found that the legislation at issue was not targeted at the government's contracting partners. As a result, we concluded that it clearly constituted a general exercise of a sovereign power. 112 F.3d at 1576. Merely because the particular means by which the government chose to breach its duties under the contract were based on its powers to tax does not offer it a defense.

The flaw in the government's argument that a change in the tax laws cannot give rise to a claim of contract breach can be demonstrated by the following example. Suppose the government contracts with a shipbuilder to construct an aircraft carrier for a fixed price. If, after the contract is completed, Department of Defense officials decide that the contract was improvident in that the government paid too much, they cannot simply reduce the amount of the payment without being in obvious breach of the contract. The case is no different if it is Congress that decides the contract was unduly generous to the contractor; again, Congress plainly cannot enact legislation reducing the amount of the payment to the contractor without causing a breach of the contract. The case would not be different if Congress took the same step but packaged it in the form of a change in the Internal Revenue Code. Thus, a "windfall profits" tax imposed on the particular shipbuilding contractor in connection with the aircraft carrier contract would be as much a breach of the contract as a simple refusal to pay the agreed-upon

amount or the enactment of legislation prohibiting the Department of Defense from making the agreed-upon payment. Nor should it make any difference if Congress achieved the same reduction in the benefits to which the contractor was entitled under the contract by enacting a targeted statute that reduced the particular shipbuilding contractor's right to deduct certain business expenses in connection with the contract. To the extent that the government's argument relies on the fact that Congress effected the reduction in the benefits of the contract in this case (and thus reduced the cost of the contract to the government) by the indirect means of denying the contractor a tax benefit to which the contractor had previously been entitled, we reject that argument as being based on a distinction in form, not substance.

We agree with the trial court that the governmental action at issue in this case did not involve the exercise of a sovereign power, because it was designed specifically to allow the government to reappropriate the profits that the plaintiffs expected to obtain from the acquisition transaction, thereby abrogating the government's obligations under the contract. For that reason, we find that neither the unmistakability doctrine nor the related sovereign acts doctrine is applicable here, and we therefore hold that the trial court was correct in finding that the enactment of the Guarini amendment led to a breach of the covenant of good faith and fair dealing.

V

For its next argument on the merits, the government invokes the Termination Agreement that the FDIC entered into with CTX and Texas Trust in 1995, which had the effect of transferring the acquired thrifts back to the government. The FDIC entered into

the Termination Agreement in its capacity as successor to FSLIC and manager of the FSLIC Resolution Fund ("FRF").

The government argues that the Termination Agreement contained a broad mutual waiver of rights by the parties, which had the effect of barring the plaintiffs from bringing this action. Under the Termination Agreement, according to the government, the Assistance Agreement ended as of the closing date of the Termination Agreement, and the performance of the respective obligations of the parties set forth in the Termination Agreement constituted a complete accord and satisfaction of the obligations created by the Assistance Agreement. Furthermore, the government contends that in the mutual waiver provisions of the Termination Agreement, the FDIC manager of the FRF waived all claims against CTX and Texas Trust, and CTX and Texas Trust agreed to release the FDIC manager and the FRF "from and against any and all actions and causes of action."

The problem with the government's waiver argument is that the Termination Agreement contained a clause that specifically reserved to CTX and Texas Trust the right to bring an action against the United States for breach of contract based on legislation that eliminated or reduced contractual benefits flowing from the acquisition transactions. The description of the kind of action that was reserved and excluded from the scope of the waiver of rights fits the present action perfectly.

Section 9.2 of the Termination Agreement provided as follows:

Release by Texas Trust and CTX. Texas Trust and CTX hereby release . . . each of the FDIC Manager and the FRF (and the respective successors, assigns, employees, agents and representatives of each of the foregoing) (collectively, "FDIC Released Persons") from and against any and all actions and causes of action . . . that Texas Trust and CTX now have, have had at any time heretofore, or hereafter may have against

the FDIC Released Persons by reason of any act or omission whatsoever by any FDIC Released Persons of the Assistance Agreement, or any other agreements related thereto; . . . .

That section of the agreement, however, contained several provisos limiting the scope of the release, one of which read as follows:

provided, that the release provided in this Section 9.2: . . . (iv) shall not operate in any way to limit the ability of CTX or Texas Trust to bring any claim against the United States or any agency or instrumentality thereof (other than the FDIC Manager) based on legislation that resulted in the reduction or elimination of contractual benefits with respect to the December 29, 1988 FSLIC (later, FRF) -assisted acquisition of substantially all of the assets and the secured and deposit liabilities of the Acquired Associations, and in the event that any such claim is brought, the FDIC Manager shall not be obligated to pay the expenses of such litigation and shall not be entitled to share in any recoveries.

The government argued in the Court of Federal Claims that, notwithstanding the proviso, section 9.2 of the Termination Agreement had the effect of releasing the government as a whole from liability for any breach and should bar the plaintiffs' suit. The trial judge rejected that argument, ruling that section 9.2 of the agreement did not waive the plaintiffs' rights against the United States, particularly in light of the proviso that made clear the parties contemplated that CTX and Texas Trust were reserving the right to sue the United States for breach of contract based on the enactment of the Guarini amendment.

On appeal, the government argues that by releasing the FDIC manager, whom the government describes as the "legal successor to the FSLIC and the FHLBB," the necessary effect was to release the government as a whole. The government contends that if the entry of the FHLBB and FSLIC into the original contract gave rise to a right to sue the United States, "it logically follows that the termination of that contract through an accord and satisfaction concluded by the legal successor to FSLIC and the FHLBB

terminated any right to sue the United States, even though the United States was not named as a party to the Termination Agreement."

That argument ignores the proviso in section 9.2 of the Termination Agreement, quoted above, in which the parties expressly excepted suits against the United States, based on the enactment of the Guarini amendment, from the scope of the mutual waiver. Therefore, whatever the effect of the waiver as to the FDIC manager might have been in the absence of that proviso, the Termination Agreement cannot be interpreted as terminating the right to sue the United States when the agreement explicitly reserved that right. Oddly, the government contends that the plaintiffs' interpretation of the Termination Agreement as reserving the right to sue the United States "renders the reservation meaningless." In fact, it is the government's interpretation that would render the reservation of rights in the proviso to section 9.2 meaningless by giving it no effect and thus treating it as if it were not there.

The government also argues that any damages resulting from a breach of contract action such as this one would be paid from the FSLIC Resolution Fund and that this action was therefore, in effect, an action against the FDIC in its capacity as manager of the FRF. For that reason as well, the government contends that the proviso reserving the right to sue the United States did not reserve any right to bring an action for breach of contract.

The trial court rejected that argument on the ground that the parties themselves distinguished between the United States and the FDIC, and that it would therefore be inconsistent with the Termination Agreement to consider a release of the FDIC to constitute an implicit release of the United States. We agree with the trial court.

Because it was the clear intention of the parties, illustrated by the proviso to section 9.2 of the Termination Agreement, to preserve the right to bring an action of the sort brought in this case, the agreement cannot be read to foreclose the plaintiffs from bringing this action by implication. The agreement barred an action directly against the FDIC, but to the extent that an action against the United States is considered to implicate the FDIC, such as by requiring that any judgment be paid from the FRF, the reservation of the right to sue the United States in the Termination Agreement must be interpreted to permit such an action. Accordingly, we reject the government's argument that the Termination Agreement barred the plaintiffs from pursuing the present action against the United States.

VI

Finally, the government argues briefly that the award of damages was incorrect. That argument, however, is really just a reprise of arguments made elsewhere in its brief. First, the government reiterates its contention that neither Texas Trust nor CTX had sufficient income to obtain any tax benefits, and that because Centex Corporation was not a party to the contract, the award of damages must be reversed. As we have explained, however, each member of the Consolidated Group was severally liable for the Group's entire tax obligation. The government does not contend that the Consolidated Group was not in a position to take full advantage of the disputed deductions. Therefore, the award of damages to parties that could benefit by having their legal obligations reduced by the amount of the award was proper.

The government further argues that it was by no means certain, even in the absence of the enactment of the Guarini amendment, that the plaintiffs would have

been entitled to deduct the built-in losses on the covered assets. Again, we have already held that prior to the Guarini amendment those losses were deductible. Thus, contrary to the government's contention, the loss of the right to take those deductions caused actual injury to the plaintiffs and therefore could properly be made the subject of an award of damages.

VII

In their cross-appeal, Centex Corporation and CTX argue that in light of the Termination Agreement they are entitled to twice as much money as they were awarded. Under the terms of the Assistance Agreement, CTX and Texas Trust agreed to share with FSLIC 50 percent of the tax savings resulting from the acquisition transaction. Centex Corporation and CTX contended before the trial court that section 9.2 of the Termination Agreement changed that arrangement and allowed them to recover 100 percent of those savings in the event they prevailed in this lawsuit. The trial court disagreed, holding that Centex Corporation and CTX were entitled to no more than the benefit of the original bargain and thus were entitled to only 50 percent of the tax savings. The breach by the government deprived the plaintiffs of only that 50 percent share of the tax savings, the court explained, and the language of section 9.2 of the Termination Agreement did not have the effect of assigning to Centex Corporation and CTX the tax benefits that were to be allocated to FSLIC under the Assistance Agreement.

The plaintiffs first contend that section 9.2 of the Termination Agreement should be interpreted as giving them a right to all of the tax benefits referred to in the Assistance Agreement in exchange for their undertaking to pursue and pay the

expenses of this litigation on their own. Thus, they argue that the Termination Agreement effectively increased their share of the tax benefits from 50 percent to 100 percent in return for the FDIC's being released from its obligation to indemnify the plaintiffs for their legal fees. In addition, the plaintiffs argue that even if their interpretation of the Termination Agreement is not clearly correct, it should nevertheless be accepted because it was a reasonable interpretation and the FDIC failed to suggest a contrary interpretation at the time the Termination Agreement was executed.

We agree with the trial court that the plaintiffs' interpretation of the Termination Agreement as effectively expanding their rights to the tax benefit is incorrect and, moreover, is not a reasonable construction of the language of the agreement. The plaintiffs rely primarily on section 9.2 of the Termination Agreement, which states that if a claim is brought against the government based on the enactment of the Guarini amendment, "the FDIC Manager shall not be obligated to pay the expenses of such litigation and shall not be entitled to share in any recoveries." The agreement to surrender any share of any recovery obtained as a result of a lawsuit, however, is not the same as an agreement that the plaintiffs are entitled to a recovery in such a lawsuit that is twice as large as the damages they suffered as a result of the contract breach that is the subject of the suit. Thus, the language of the Termination Agreement that is in dispute does not permit the plaintiffs to receive more than a 50 percent share in the total tax savings. Rather, it simply permits the plaintiffs to keep the entirety of any award they receive from the government free from any claim by the FDIC. We agree with the trial court that the plaintiffs are only entitled to 100 percent of the damages they suffered from the breach of their contract with the government, which consisted of 50

percent of the tax savings that would have resulted if the contract had not been breached and the plaintiffs had been allowed to deduct all of their covered asset built-in losses.

Because we find that the plaintiffs' interpretation of the Termination Agreement is not reasonable, we need not address the plaintiffs' argument that the FDIC failed to disclose a contrary interpretation. The only reasonable interpretation of this contract is one in which the plaintiffs retain only the original 50 percent of the tax savings that they bargained for.

VIII

In summary, we affirm the judgment of the Court of Federal Claims in full. We hold that the contract is not unenforceable on the ground that neither plaintiff had standing to sue for its breach. We also hold that the action was not barred by section 9.2 of the Termination Agreement. On the merits, we hold that the trial court was correct to conclude that the Assistance Agreement contained an implied promise of good faith and fair dealing that was breached when Congress passed targeted legislation that effectively appropriated to the government a substantial portion of the benefits that the plaintiffs reasonably expected from the operation of the Agreement. As a result, the government is liable for the damages calculated by the trial judge for breach of contract. With respect to the plaintiffs' request on the cross-appeal for an increase in the damages award, we hold that the trial court properly limited the damages for breach of the Assistance Agreement to the loss suffered by the plaintiffs as a result of the breach, i.e., the portion of the tax benefits that would have been available to the plaintiffs under the Assistance Agreement.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED</u>.
