ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| WSP USA Solutions Inc. | ) ASBCA No. 62674 |
| | ) |
| Under Contract No. W911WN-15-D-0001 | ) |

APPEARANCES FOR THE APPELLANT:       David M. Nadler, Esq.
                                                                    Scott Arnold, Esq.
                                                                    Carolyn R. Cody-Jones, Esq.
                                                                      Blank Rome LLP
                                                                      Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                                                      Engineer Chief Trial Attorney
                                                                    Richard J. Sprunk, Esq.
                                                                    Olivia J. Estay, Esq.
                                                                    Thomas X. McHugh, Esq.
                                                                      Engineer Trial Attorneys
                                                                      U.S. Army Engineer District, Pittsburgh

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal involves a contract for WSP USA Solutions Inc. (WSP) to provide the U.S. Army Corps of Engineers (USACE) with temporary emergency power services required for declared federal disasters. Specifically, the appeal arises from work performed under three task orders (TOs) issued in response to Hurricanes Irma and Maria to provide emergency power services in Puerto Rico and the U.S. Virgin Islands (USVI). WSP argues that work performed pursuant to these TOs during the contract's third option year should have been priced at the contract's higher rates for that option year, and not at the rates for the second option year, during which all three TOs were issued. WSP alleges that USACE's failure to pay it at Option Year 3 rates for this work constituted breaches of both the contract and the implied covenant of good faith and fair dealing. USACE asserts that WSP was appropriately paid for its services pursuant to the agreed upon Option Year 2 rates. The Board has jurisdiction over this appeal pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. Both parties elected to submit this appeal on the record pursuant to Board Rule 11 and requested that the Board decide both entitlement and quantum.

We hold that the contract unambiguously provides that the pricing for each TO is set when the order is placed and remains in place for duration of the work under the

TO, even if the period of performance extends beyond the original term of the underlying contract or option period. Therefore, we deny the appeal.

FINDINGS OF FACT

1. On October 22, 2014, USACE awarded Contract No. W911WN-15-D-0001 (the contract) to WSP to provide temporary emergency power services required for declared federal disasters (R4, tab 2 at 12-13, 27).[*]

2. The contract was an indefinite quantity indefinite delivery contract with a base period of one year and four option years (R4, tab 2 at 13-22). The contract's initial total contract price was $94,985,000.00 (*id*. at 13).

3. Section B of the contract included two firm-fixed price contract line item numbers (CLINs) for the base year and for each option year: (i) ACI Emergency Power, and (ii) Readiness and Preparedness (R4, tab 2 at 13-22). The ACI Emergency Power CLINs covered:

> ALL LABOR, TRANSPORTATION, EQUIPMENT,
> MATERIALS SUPERVISION, AND REQUIRED
> INTERNAL LOGISTIC SUPPORT TO PERFORM
> GENERATOR SET ACTIVITIES . . . .

(*Id.* at 13, 15, 17, 19, 21)

4. The base year and the four option years were scheduled as follows:

> Base Year: October 22, 2014 – October 21, 2015
> Option Year 1: October 22, 2015 – October 21, 2016
> Option Year 2: October 22, 2016 – October 21, 2017
> Option Year 3: October 22, 2017 – October 21, 2018
> Option Year 4: October 22, 2018 – October 21, 2019

(R4, tab 2 at 62-63)

5. Generally, the contract required WPS to mobilize its employees and government-supplied generators in response to federal disaster declarations. The contract called for three distinct phases of work: Mission Readiness, Mission Mobilization, and Mission Execution. (R4, tab 2 at 27)

---

[*] The parties numbered pages in their Rule 4 submissions with a prefix of letters and/or leading zeros. We have dropped the prefix and leading zeros and just cite the numeric page number.

2

6. The contract provided for pricing schedules in the base and option years that identified the line items being ordered and the rate to be paid for those items. The rate schedule for each option year (Attachment 1) had corresponding rate increases over the life of the contract. (R4, tab 2 at 91-95) The contract stated:

> THE CONTRACTOR SHALL PROVIDE PRICING IN ACCORDANCE WITH THE NARRATIVE IN SECTION B AND THE CORRESPONDING RATE SCHEDULE INCLUDED AS ATTACHMENT 1, WHICH WILL BE INCLUDED IN THE CONTRACT.

(*Id.* at 13)

7. Attachment 1 included an approximately three percent increase in the rates for each successive option year for each line item of labor, equipment, and parts for servicing generators (R4, tab 2 at 91-95).

8. Section F of the contract included a chart entitled "Delivery Information" that listed each CLIN next to a range of delivery dates. These delivery dates corresponded with the contract's base and option year periods. (R4, tab 2 at 62-63)

9. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.243-1 Alt I, CHANGES – FIXED PRICE (AUG 1987) – Alternate I (Changes Clause) (R4, tab 2 at 68). The Changes Clause provided:

> (a) The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:
> (1) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.
> (2) Method of shipment or packing.
> (3) Place of delivery.
> (b) If any such change causes an increase or decrease in the cost of, or the time required for, performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

(c) The Contractor must assert its right to an adjustment under this clause within 30 days from the date of receipt of the written order. However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.

(d) If the Contractor's proposal includes the cost of property made obsolete or excess by the change, the Contracting Officer shall have the right to prescribe the manner of the disposition of the property.

(e) Failure to agree to any adjustment shall be a dispute under the Disputes clause. However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

FAR 52.243-1 Alt I.

10. The contract included FAR 52.216-18, ORDERING (OCT 1995) (Ordering Clause). This clause provided:

(a) Any supplies and services to be furnished under this contract shall be ordered by issuance of delivery orders or task orders by the individuals or activities designated in the Schedule. Such orders may be issued from date of contract award through expiration date of the base contract year unless extended in accordance with FAR Clause 52.217-9 "Option to Extend the Term of the Contract".

(b) All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(c) If mailed, a delivery order or task order is considered "issued" when the Government deposits the order in the mail. Orders may be issued orally, by facsimile, or by electronic commerce methods only if authorized in the Schedule.

(R4, tab 2 at 69)

11. The contract included FAR 52.216-21, REQUIREMENTS (OCT 1995) (Requirements Clause). This clause provided:

4

(a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

(d) The Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract.

(e) If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

(f) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after the last established final delivery date of any task order.

(R4, tab 2 at 69-70)

12. The contract included FAR 52.216-19, ORDER LIMITATIONS (OCT 1995) (Order Limitations Clause). This clause provided:

> (a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than $1,000.00, the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.
> (b) Maximum order. The Contractor is not obligated to honor:
> (1) Any order for a single item in excess of $15,000,000.00 for ACI Emergency Power and $15,000.00 for Readiness and Preparedness;
> (2) Any order for a combination of items in excess of $95,000,000.00 for ACI Emergency Power and $15,000.00 for Readiness and Preparedness;
> (3) A series of orders from the same ordering office within 30 days that together call for quantities exceeding the limitation in subparagraph (1) or (2) above.
> (c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) above.
> (d) Notwithstanding paragraphs (b) and (c) above, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within one day after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(R4, tab 2 at 69)

13. USACE exercised the contract's first option year on August 28, 2015. This option was effective from October 22, 2015 through October 21, 2016. (R4, tab 4 at 300)

6

14. USACE exercised the contract's second option year on September 14, 2016. This option was effective from October 22, 2016 through October 21, 2017. (R4, tab 6 at 314, 326-27)

15. USACE exercised the contract's third option year on August 16, 2017. This option was effective from October 22, 2017 through October 21, 2018. (R4, tab 8 at 328, 333-34)

16. On or about September 6, 2017, Hurricane Irma caused widespread damage in USVI and Puerto Rico (gov't br. ¶ 20). On or about September 20, 2017, Hurricane Maria made landfall in USVI as a Category 5 storm and in Puerto Rico as a Category 4 storm (*id*. ¶ 21; R4, tab G-18 at 16516). Hurricane Irma caused extensive damage to USVI and Puerto Rico's electrical grids, and then Hurricane Maria completely destroyed both grids, causing a total power loss. (R4, tab G-18 at 16516)

17. In response to these disasters, on September 20, 2017, USACE issued TO W911WN17F3031 (3031) at a price of $444,854.24 to provide emergency power services in Puerto Rico (R4, tab 18 at 376-77). This TO was modified 23 times between September 22, 2017 and September 18, 2018 to increase funding and/or to extend the mission (R4, tabs 19-41).

18. On September 25, 2017, USACE issued TO W911WN17F3033 (3033) at a price of $5,244,301.09 to provide temporary emergency power services in USVI until October 9, 2017 (R4, tab 44 at 454-55). This TO was modified nine times between October 6, 2017 and February 15, 2018 to increase funding and/or extend the mission (R4, tabs 45-53).

19. On October 6, 2017, USACE issued TO W911WN18F3001 (3001) at a price of $300,000.00 to provide emergency power services in Puerto Rico until October 14, 2017 (R4, tab 55). TO 3001's initial funding was erroneously obligated to CLIN 3001 but was moved to CLIN 2001 via Unilateral Modification No. P00001 on October 10, 2017 (R4, tab 56). TO 3001 was modified nine times between October 11, 2017 and March 19, 2018 to increase funding and/or to extend the mission (R4, tabs 57-65).

20. In mid-October 2017, USACE realized that substantial additional funding would be necessary to complete the missions in USVI and Puerto Rico under the contract due to the extensive hurricane damage. (R4, tab G-24 (Kaufmann dep.) at 16605-06). USACE accordingly contacted the chain of command to seek a justification to increase the contract's capacity. (*Id.* at 16606)

21. On November 15, 2017, USACE executed a Justification Review for Other than Full and Open Competition (J&A) (R4, tab G-19; app. supp. R4, tab A-8).

22. On November 17, 2017, in connection with the J&A, USACE issued a Determination and Findings Award of a Single-Source Task Order Contract in Excess of $112 Million for Advanced Contract Initiative Temporary Emergency Power (D&F) to facilitate approval of the funding increase (R4, tab G-18).

23. On November 22, 2017, in connection with the J&A and the D&F, USACE issued a modification increasing the contract's ceiling from $95 million to $955 million. The modification stated that "[a]ll other terms and conditions remain unchanged." (R4, tab 13 at 363)

24. On September 28, 2018, WSP submitted a request for equitable adjustment (REA) to USACE in the amount of $13,489,630.00 (R4, tab 149 at 15126). This REA sought an adjustment to prices for performance under TOs 3031, 3033, and 3001 that took place during Option Year 3 of the contract. (*Id.*) The amount reflected what WSP claimed to be the difference between the applicable Option Year 3 rates and the Option 2 rates it had previously invoiced. (*Id.*)

25. On February 20, 2019, WSP updated its REA to account for additional work performed between August 29, 2018 and the end of the mission on November 20, ¶ 2018 (R4, tab 150 at 15130). This amended REA requested a total payment of $14,220,817.00. (*Id.*)

26. On May 17, 2019, USACE's contracting officer (CO) denied WSP's REA in its entirety (R4, tab 153 at 15140-41). In denying the REA, the USACE's CO asserted that the Option Year 2 rates applied to all work WSP performed under the relevant TOs—regardless of when the work was performed—because the TOs were executed during Option Year 2 (*id*. at 15140).

27. On March 16, 2020, WSP submitted a certified claim to the CO in the amount of $14,069,044.60 (R4, tab 154 at 15144). This amount reflected the difference between Option Year 2 rates invoiced during contract performance and Option Year 3 rates. WSP alleged it was owed for services rendered during Option Year 3 to the end of the mission (*id*. at 15144-45).

28. On July 1, 2020, the CO issued a final decision denying WSP's claim in its entirety (R4, tab 1).

29. On September 24, 2020, WSP filed this appeal with the Board.

DECISION

*The Parties' Contentions*

WSP argues that the contract's language provided that Option Year 3 rates applied to work performed during Option Year 3, and thus it should have been paid Option Year 3 rates for work performed during Option Year 3 under the relevant TOs (app. br. at 2). WSP alleges that USACE's failure to pay at Option Year 3 rates for this work constituted breaches of both the contract and the implied covenant of good faith and fair dealing. (*Id*.). USACE asserts that Option Year 2 prices applied to all work performed under these TOs because the TOs were issued during Option Year 2 (gov't br. at 28-31) and that WSP failed to timely assert its right to an adjustment under the Changes Clause (*id*. at 31-36).

*Standard of Review*

Board Rule 11 allows the parties to waive a hearing and instead have the Board issue a decision based on the record. ASBCA Rule 11(a). "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'" *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citing *Grumman Aerospace Corp.*, ASBCA No. 35185, 92-3 BCA ¶ 25,059 at 124,886 n.13). As the proponent of the claim, WSP bears the burden of proving liability and damages in this appeal. *Stobil Enter.*, ASBCA Nos. 61688, 61689, 19-1 BCA ¶ 37,400 at 181,809 (citing *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994)).

*The Contract Supports USACE's Interpretation*

WSP argues that the contract unambiguously required USACE to pay it at Option Year 3 rates for work performed during Option Year 3 and that USACE's failure to do so constituted a breach of the contract (app. br. at 20-27; app. reply at 2-7). USACE contends that the contract's terms do not support WSP's interpretation and that it properly compensated WSP at Option Year 2 rates (gov't br. at 28-31).

Contract terms must be interpreted and read as a whole, giving reasonable meaning to all of their parts, and without leaving "a portion of the contract useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Board must look to the contract's plain language to determine whether an ambiguity exists. *Am. Int'l Contractors, Inc.*, ASBCA No. 60948, 18-1 BCA ¶ 37,061 at 180,411. A contract is ambiguous if it is reasonably susceptible to more than one interpretation. *Edward R. Marden Corp. v. United States*,

803 F.2d 701, 705 (Fed. Cir. 1986).  It is not enough that the parties differ in their respective interpretations of the contract's terms for an ambiguity to exist.  *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999).  Rather, each party's interpretation must fall within a "zone of reasonableness."  *Id.*; *see also WPC Enters., Inc. v. United States*, 323 F.2d 874, 876 (Ct. Cl. 1963).  If the contract's terms are clear and unambiguous, they must be given their plain and ordinary meaning.  *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).  The Board may not use extrinsic evidence to "introduce an ambiguity where none exists."  *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994); *see also Am. Int'l Contractors Inc.*, 18-1 BCA ¶ 37,061 at 180,411.

WSP argues that the contract unambiguously tied the rates that USACE was obligated to pay it to the periods of performance during which the work under the contract was performed (app. br. at 23).  Regarding the rates for each period of performance, the contract states:

> THE CONTRACTOR SHALL PROVIDE PRICING *IN ACCORDANCE WITH THE NARRATIVE IN SECTION B AND THE CORRESPONDING RATE SCHEDULE INCLUDED AS ATTACHMENT 1*, WHICH WILL BE INCLUDED IN THE CONTRACT.

(Finding 6) (emphasis added)  According to WSP, because Attachment 1 set forth firm-fixed labor rates for each period of performance, the rates were tied to the period of performance during which the work was completed, and not when the relevant TO was issued.  Additionally, WPS asserts that the delivery dates in the "Delivery Information" chart in Section F of the contract listed each CLIN next to a delivery date, unambiguously tie each CLIN to a specific period of performance (app. br. at 22).  Furthermore, because none of the TOs relevant to this appeal modified Attachment 1 nor amended the contractual rates applicable to work performed during the base year and each option year, when USACE exercised Option Year 3, WSP contends that USACE became obligated to pay WSP at Option Year 3 rates for work performed during that option year (*id.* at 24).

In contrast, USACE contends that the contract's periods of performance defined the ordering periods during which it could place orders and the pricing that corresponded to these orders (gov't br. at 29).  In other words, USACE asserts that WSP's obligations and right to payment were set when it issued the TOs and continued to be governed by Option Year 2's terms regardless of the fact that performance of TOs 3031, 3033, and 3001 carried over into Option Year 3's calendar period (*id.* at 30).

10

According to the USACE's interpretation of the contract, at the time it issued the TOs in question, the only CLIN available was 2001, and therefore Option Year 2 pricing was properly applied to these TOs and all subsequent modifications to the TOs (*id*. at 29). In support of its interpretation, USACE cites the Ordering Clause, which states that a TO "may be issued from the execution of the contract through the expiration of the base contract year unless extended . . . ." (finding 10). USACE contends that, because the contract was extended, it follows that it could have placed a TO up to and including the final day of Option Year 2 (gov't br. at 29). Furthermore, USACE argues that the performance period for TOs issued during Option Year 2 was governed by the Requirements clause (*id*.), which stated in part:

> (f) Any order issued during the *effective period of this contract* and not completed within that period shall be completed by the Contractor within the time specified in the order. *The contract shall govern the Contractor's and Government's rights and obligations* with respect to that order to the same extent as if the order were completed during the contract's effective period . . . .

(Finding 11) (emphasis added) Because the relevant TOs were not completed within Option Year 2's effective period, USACE reasons, they were intended to be completed within the timeframe specified within each TO (gov't br. at 30).

We agree. The FAR 52.216-21 Requirements clause states that the rights and obligations of the parties (e.g., pricing) are established at the time the task order is placed and that those obligations remained fixed for the duration of the work required under that order. This is true even if the work under the task order continues beyond the effective date of the underlying contract.

Additional support for the government's position can be found in FAR ¶ 16.505(a)(2) (Ordering), which provides:

> (2) Individual orders shall clearly describe all services to be performed or supplies to be delivered so the full cost or price for the performance of the work can be established when the order is placed. Orders shall be within the scope, issued within the period of performance, and be within the maximum value of the contract.

This means that the pricing for each TO is set *when the order is placed*. When read in conjunction with the requirements clause at FAR 52.216-21, this clarifies that the pricing for a TO is set when the order is placed and remains in place for duration of the work under the TO, even if the period of performance extends beyond the original

11

term of the underlying contract or option period. Thus, even if the government exercises the subsequent option period after placing a TO, it does not affect the pricing of the work being performed pursuant to the TO. In our view, this provision is intended to eliminate the very confusion raised by appellant's arguments in this appeal.

Additional support for our interpretation is found in *Securityhunter, Inc.*, ASBCA No. 60896, 18-1 BCA ¶ 36,981 at 180,135. In *Securityhunter*, the contractor sought to be released from performance on the grounds that its obligation to complete performance of work under a task order ended when the order and base contract periods of performance expired. The Board found otherwise, holding that the obligation to perform did not automatically disappear upon expiration of the contract's period of performance. The Board reasoned that "[r]elieving Securityhunter of its contractual obligations to complete that work merely because it failed to perform on time would render the contract illusory and void." *Id.* at 180,137. As the Board noted, this is true even when the government may have been responsible for delaying performance – in that situation, the contractor generally is obligated to perform after the impairment is removed. *Id.* (Citing *Consolidated Molded Prods. Corp. v. United States*, 600 F.2d 793 (Ct. Cl. 1979)).

In this appeal, USACE exercised Option Year 3 on August 16, 2017, prior to issuing the TOs at issue (finding 15). USACE subsequently issued the TOs shortly before the end of Option Year 2 (finding 17-19). However, even if USACE had not exercised the third option year, WPS would still have been obligated to continue performance of the task orders until complete. Moreover, because USACE issued the TOs during Option Year 2, the pricing for the TOs was based upon the Option Year 2 price schedule. Indeed, had USACE not exercised Option Year 3, there would have been no reason to consider whether to apply the Option Year 3 pricing schedule. In sum, the obligation to perform, and the pricing associated with that performance, is established upon the date the task order is placed.

*USACE Did Not Breach The Implied Warranty of Good Faith and Fair Dealing*

Additionally, WSP argues that USACE breached the implied warranty of good faith and fair dealing by failing to pay it at Option Year 3 rates for work performed during Option Year 3 (app. br. at 27-30; app. reply at 12-13). "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). The covenant imposes obligations on both contracting parties that include the "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* This duty applies to the government just as it does to private parties. *Id.* Failure to

fulfil the implied covenant of good faith and fair dealing constitutes a breach of the contract. *Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).

Because we have found that the contract did not obligate USACE to pay WSP at Option Year 3 rates, we need not reach whether the failure to do so breached the implied warranty of good faith and fair dealing. A party to a contract cannot use an implied duty of good faith and fair dealing to "expand another party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Agility Pub. Warehousing Co. v. Mattis*, 852 F.3d 1370, 1384 (Fed. Cir. 2017) (quoting *Metcalf Constr. Co v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014)). Therefore, because USACE's actions were consistent with the contract's terms, they cannot have breached the implied duty of good faith and fair dealing.

*WSP's Claim is not Waived*

USACE argues that even if WSP interpreted the contract correctly, its claim is invalid because it failed to timely preserve its rights under the Changes Clause (gov't br. at 31-32). Because we uphold USACE's interpretation of the contract, we need not address its affirmative defense of waiver.

<u>CONCLUSION</u>

Because the contract unambiguously tied the rates at which USACE was to pay WSP to the dates the relevant TOs were placed, we hold that USACE did not breach the contract by failing to pay WSP at Option Year 3 rates for work performed during Option Year 3 of the contract. Accordingly, we deny the appeal.

Dated: October 13, 2022

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

13

I concur                                 I concur

RICHARD SHACKLEFORD             J. REID PROUTY
Administrative Judge                   Administrative Judge
Acting Chairman                       Vice Chairman
Armed Services Board              Armed Services Board
of Contract Appeals                of Contract Appeals


      I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62674, Appeal of WSP USA Solutions Inc., rendered in conformance with the Board's Charter.

      Dated: October 13, 2022


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

14